**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

421-A TENANTS ASSOCIATION INC., VINETTA SCRIVO, and RICHARD LEBED, on behalf of themselves and all others similarly situated,

                              Plaintiffs,

           v.

125 COURT STREET LLC; TWO TREES MANAGEMENT CO. LLC; 30 MAIN LLC; DW ASSOCIATES, LP; DAVID C. WALENTAS and JED D. WALENTAS,

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No.:

**ECF Case**

**COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

      Plaintiffs 421-A TENANTS ASSOCIATION INC., VINETTA SCRIVO and RICHARD LEBED ("Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege as follows:

<u>**INTRODUCTION**</u>

      1.    Plaintiffs bring this lawsuit to redress and to end the illegal, fraudulent and coercive practices employed by defendants: 125 COURT STREET LLC; TWO TREES MANAGEMENT CO. LLC; 30 MAIN LLC; DW ASSOCIATES, LP; DAVID C. WALENTAS and JED D. WALENTAS ("Defendants") against tenants of residential apartments in Brooklyn. Defendants have formed an enterprise engaged in a pattern of racketeering for the purpose of furthering their scheme to unlawfully deregulate the residential apartment buildings they operate, inflating rents over and above the amounts they are legally permitted to charge under New York's rent-stabilization laws, coercing tenants into vacating apartments so that the rents can be raised when those apartments are rented out to new tenants, and unlawfully taking advantage of Section 421-a tax benefits (described in further detail, below) that are expressly conditioned on

the development of rent stabilized housing, which Defendants effectively claw back as part of their pattern of racketeering.

2.      Defendants' ongoing scheme has been (and is being) accomplished through, among other things, a pattern of fraudulent and coercive conduct, including but not limited to: misrepresenting to government agencies and to tenants the amount of the legally chargeable rent applicable to apartments in Defendants' buildings; falsely misrepresenting to tenants that they are receiving "preferential" rents below the legally chargeable rents (which are in turn misrepresented); misrepresenting tenants' rent payment status (due to Defendants' demands for unlawfully inflated rents); filing meritless eviction suits that incorporate Defendants' misrepresentations and demands for unlawfully inflated rents; extortion; coercion; and providing false information to government agencies, including the New York City Department of Housing Preservation and Development, New York State Division of Housing and Community Renewal, and New York State Department of Finance.

3.      Defendants' scheme is intended to create a climate of hopelessness and fear among tenants, to intimidate, discourage and prevent them from challenging Defendants' illegal actions as part of a conspiracy to: (i) unlawfully deregulate apartments (in order to unlawfully inflate rents); and (ii) collect tax breaks under Section 421-a of the Real Property Tax Law of the State of New York (N.Y. Real Prop. Tax Law §421-a) ("Section 421-a") while circumventing Section 421-a's mandate that all apartments in buildings receiving Section 421-a tax breaks are subject to New York City's Rent Stabilization Law (New York City Administrative Code Chapter §§26-501 *et seq.*) (the "RSL") and Chapter 6 of Title 28 of the Rules of the City of New York (the "421-a Rules").

## NATURE OF THE ACTION

4.      Defendants David C. Walentas and Jed D. Walentas (together, the "Walentas Defendants") are billionaire real estate developers.  They direct and control a large enterprise (the "Walentas Enterprise") consisting of individuals, corporations, LLCs, and partnerships that directly or indirectly hold legal title to, or manage, apartment buildings in Brooklyn and Manhattan under the "Two Trees" name.  Through the Walentas Enterprise, Defendants engage in reckless and intentional systematic acts and business practices of demanding and collecting rents in amounts beyond those permitted under the law, including but not limited to New York's Rent Stabilization Laws and Rent Stabilization Code.  In addition, Defendants' ongoing pattern of fraudulent practices violates the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962.

5.      The Defendants' unlawful acts are part of an overall pattern and practice of fraudulent management and extortion, all directed at the goal of illegally increasing regulated rents or evicting tenants entitled to rent regulation.  The pattern includes:

a.      Collecting or threatening to collect rent in amounts that are not permitted under the law, based on misrepresentations as to an apartment's historical legal regulate rent and actual rents, on which the legal regulated rent is based;

b.      Collecting or threatening to collect rent in amounts that are not permitted under the law, based on misrepresentations as to the cost and status of repairs and capital improvements;

c.      Failing to make timely and necessary repairs, to address housing maintenance code violations, and to provide essential, required services in order to coerce rent stabilized tenants into moving out;

d.      Commencing unfounded eviction actions based on misrepresentations as to the amount of legal rent that is purportedly due and owing, when, in fact, the rents purportedly due and owing are misrepresented and unlawfully inflated;

e.      Unjustifiably refusing to provide tenants with documents that the tenants are lawfully entitled to receive;

f.      Failing to comply with requirements to correct housing violations;

g.      Refusing to respond to and ignoring tenants' inquiries and requests for documents relating to rental histories, rent increases based on individual apartment improvements and major capital improvements, and lease renewals, all with the purpose of preventing tenants from discovering that the rent being charged is unlawfully excessive;

h.      Altering documents relating to rental histories as a means of misrepresenting the amount of rent Defendants are lawfully entitled to collect; and

i.      Providing false and misleading information to government agencies, including, without limitation, the New York City Department of Housing Preservation and Development, New York State Division of Housing and Community Renewal, and the New York State Department of Finance.

6.      In connection with their fraudulent practices, Defendants have employed the U.S. mails and wires, and have engaged in extortion, coercion and obstruction of justice as part of their ongoing scheme to increase rents unlawfully, to receive illegal rents, to ultimately (unilaterally and unlawfully) free their properties from New York's rent stabilization requirements, and to receive Section 421-a tax breaks that they are not legally entitled to receive. Defendants' pattern of racketeering activity and unlawful tactics has injured countless present and former tenants, deprived them of their lawful property interests in their apartments and forced them to pay money to Defendants which Defendants otherwise have no lawful entitlement to receive.

7.      Plaintiffs seek a judgment from this Court, as set forth below, providing (a) declaratory relief; (b) injunctive relief; (c) appointment of an independent monitor to oversee the lawful operation and management of the rent-regulated buildings owned by Defendants and to assist in the resolution of disputes between Defendants and their tenants; (d) an audit and accounting of rents demanded by Defendants and disgorgement of any rent overcharges; (e) compensatory, statutory, and punitive damages; (f) disgorgement of all unlawfully obtained Section 421-a tax breaks; (g) equitable reformation of tenants' leases; (h) reasonable attorneys' fees and costs; and (i) any other relief this Court deems just and proper.

## PARTIES

8.      Plaintiff 421-A TENANTS ASSOCIATION INC. ("Court House Tenants Association")[1] is a corporation defined under the New York Not-for-Profit Law.  Court House Tenants Association is incorporated for the purpose of allowing its members to associate for their mutual benefit as tenants, to represent its members' point of view to owners and managing agents, to provide its members with information relating to their rights as tenants, to promote good will and cooperation among its members, and generally to do any and all acts suitable, proper and conducive to the successful conduct of a tenants association.  Court House Tenants Association is a "Person" within the meaning of 18 U.S.C. §1964(c).  Court House Tenants Association conducts business in Brooklyn, New York.

9.      Plaintiff VINETTA SCRIVO ("Ms. Scrivo") is a resident of New York City, citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment in Court House ("Court House," or the "Building"), a building located at 125 Court Street in Brooklyn, New York.  Ms. Scrivo is a "Person" within the meaning of 18 U.S.C. §1964(c).

10.      Plaintiff RICHARD LEBED ("Mr. Lebed") is a resident of New York City, citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment in Court House, a building located at 125 Court Street in Brooklyn, New York.  Mr. Lebed is a "Person" within the meaning of 18 U.S.C. §1964(c).

11.      Defendant 125 COURT STREET LLC ("125 Court") is a single purpose New York limited liability company formed in 2003 for the purposes of acquiring, developing, and

---

[1] Although this pleading utilizes the nomenclature "Court House Tenants Association" as a means to conveniently refer to Plaintiff 421-A Tenants Association, as opposed to the Section 421-a Tax Benefit, Plaintiff's membership is not limited to residents of 125 Court Street and is inclusive of residents city-wide residing in buildings subject to regulation under Section 421-a.

operating the real property known as Court House, located at 125 Court Street in Brooklyn, New York, 11201. 125 Court conducts business in Brooklyn, New York.

12. Defendant TWO TREES MANAGEMENT CO. LLC ("Two Trees") is a real estate development firm that has owned, managed and developed more than $4 billion in real estate and which currently owns and manages more than 2,000 apartments. Two Trees is known for its singular role in transforming the Brooklyn neighborhood of "DUMBO" (an acronym for Down Under the Manhattan Bridge Overpass) where the company's holdings include 12 buildings comprising more than 3 million square feet of commercial and residential real estate. Two Trees operates Court House as the managing agent for 125 Court. Two Trees is a Brooklyn-based real estate development firm that conducts business in Brooklyn, New York.

13. Defendant 30 MAIN LLC ("30 Main") is a New York limited liability company organized in 2000. 30 Main was responsible for the construction of Court House, and is the sole member (and managing member) of 125 Court. 30 Main conducts business in Brooklyn, New York.

14. Defendant DW ASSOCIATES, L.P. ("DW Associates") is a New Jersey limited partnership, and is the General Manager of 30 Main. DW Associates conducts business in Brooklyn, New York.

15. Defendant DAVID C. WALENTAS ("David Walentas") is the General Partner of DW Associates, is a principal of 125 Court, and is the founder and a principal of Two Trees David Walentas conducts business in Brooklyn, New York.

16. Defendant JED D. WALENTAS ("Jed Walentas) is a principal of Two Trees and is also its Chief Executive Officer. Jed Walentas conducts business in Brooklyn, New York.

6

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C.

§1964, which confers jurisdiction upon this Court to prevent and restrain violations of section

1962 of Chapter 96 of Title 18 (Racketeer Influenced and Corrupt Organizations), 28 U.S.C.

§1331, which confers original jurisdiction upon this Court for actions arising under the laws of

the United States, 28 U.S.C. §2201, which confers original jurisdiction upon the filing of an

appropriate pleading seeking to declare the rights and other legal relations of any interested party

seeking such declaration, and 28 U.S.C. §2202, conferring original jurisdiction concerning

further necessary or proper relief based upon a declaratory judgment.

18.     The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. §1367(a),

which confers supplemental jurisdiction over all non-federal claims arising from a common

nucleus of operative facts such that they form part of the same case or controversy under Article

III of the United States Constitution.

19.     Venue is proper in this Court pursuant to 18 U.S.C. §1965, 28 U.S.C. §1391(b)(1)

and (c), in that Defendants are subject to personal jurisdiction in this judicial district and reside,

maintain offices and conduct business in this district.

## THE APPLICABLE STATUTORY AND REGULATORY ENVIRONMENT

### A. Rent Stabilization

20.     A number of communities in New York City, including those in Brooklyn, are

subject to rent regulation programs known as "rent control" and "rent stabilization."[2]   Rent

control is the older of the two systems of rent regulation.   It dates back to New York City's

---

[2] As used in this pleading, the terms "rent regulation" and "rent-regulated" are used interchangeably and refer, inclusively, to both the statutory regimes known as "rent control" and "rent stabilization."   Nevertheless, only the statutory regime known as "rent stabilization," described below, is pertinent to the claims asserted herein.

emergency response to the housing shortage immediately following World War II and generally applies to buildings constructed before 1947.

21.     Rent stabilization generally covers buildings built after 1947 and before 1974 and apartments removed from rent control.  As discussed in detail further below, _rent stabilization also covers all buildings that receive Section 421-a tax benefits for the duration that they receive the benefit_.

22.     The New York City Rent Stabilization Law (New York City Administrative Code Chapter §§26-501 _et seq._) (the "RSL") and the New York State Rent Stabilization Code (9 NYCRR §§2520.11 _et seq._) (the "RSC"), promulgated by the New York State Division of Housing and Community Renewal, impose  statutory limits upon the rent that landlords can charge tenants.  These laws also circumscribe the manner in which landlords can raise rents, recover the costs of improvements, terminate tenancies, or commence legal proceedings against tenants.

23.     The legislative intent behind the RSL and RSC is to prevent landlord profiteering, exploitation, harassment and eviction of tenants, all of which are well-documented historic practices engaged in by Landlords.  In enacting the Emergency Tenant Protection Act, the New York State Senate made a legislative finding that:

> a substantial number of persons residing in housing not presently subject to the provisions of the emergency housing rent control law or the local emergency housing rent control act are being charged excessive and unwarranted rents and rent increases; that **preventive action by the legislature continues to be imperative in order to prevent exaction of unjust, unreasonable and oppressive rents and rental agreements** and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare….

N.Y. Unconsol. Law § 8622 (McKinney) (emphasis added).

24.     The primary public policy goal of rent stabilization is to ensure the stability of

tenant tenure, including: (1) reasonable and fair rents; (2) reasonable rent increases as determined by the Rent Guidelines Board; (3) the habitability of apartments and provision of required services for tenants; (4) the right of a tenant to renew their lease; and (5) prevention of unlawful evictions.  These goals are articulated through the statutory protections in the RSL and RSC, which, taken together, codify the "rent stabilization" of apartments subject to these statutes.

25.     Rent stabilization provides protections to tenants with respect to both the initial rental rates and increases to the rent upon renewal of a lease.  Landlords must register the initial "legal rent" with the New York City Department of Housing and Community Renewal ("DHCR") within ninety (90) days after an apartment first becomes subject to rent stabilization and must provide the tenant with a notice reciting the initial legal regulated rent ("legal rent"), in writing, *via certified mail.*   RSC §2523.1.  Thereafter, landlords must provide DHCR with updated annual registrations identifying, as of April 1 of that year, the legal rent for each regulated apartment and must provide tenants with a copy of their respective apartment's registration form.

26.     Pursuant to the RSL and RSC, landlords who do not file initial or annual statements are not eligible for rent increases and are subject to additional penalties.

27.     Rent stabilization also affords tenants with additional protections.  Generally, tenants in rent stabilized apartments must be offered renewal leases.  Leases may be renewed for a term of one or two years, at the tenant's choice, and at a rate set by the local Rent Guidelines Board.  These guideline rates are set once a year and are effective for leases beginning on or after October 1st of each year.

28.     The renewal lease offer must be made on a form created by, or on a facsimile approved by, the DHCR.  In New York City, the building owner must give written notice of

renewal or personal delivery not more than 150 days and not less than 90 days before the existing lease expires on a DHCR Renewal Lease Form (RTP-8) (the "Renewal Lease Form").

29.     After the renewal offer is made, the tenant has 60 days to choose a lease term, sign the lease, and return it to the owner.  When a tenant signs the Renewal Lease Form and returns it to the owner, the owner must return the fully signed and dated copy to the tenant within 30 days.

30.     When a tenant receives the Lease Renewal Form, a copy of either the New York City Lease Rider For Rent Stabilized Tenants ("Lease Rider") or Emergency Tenant Protection Act (ETPA) Standard Lease Addenda for Rent Stabilized Tenants ("Lease Addenda") must be attached.  The Lease Rider and Lease Addenda describe the rights and obligations of tenants and owners under the Rent Stabilization Law.  Renewal leases must keep the same terms and conditions as the expiring lease unless a change is necessary to comply with a specific law or regulation.

31.     In buildings which become eligible for Section 421-a tax breaks after July 3, 1984, the owners are also required to include in each lease (and renewal lease) a notice in at least twelve point type informing the tenant that the apartment shall become deregulated upon the expiration of the last lease entered into during the tax benefit period.  The notice also must state the approximate date on which such tax benefit period is scheduled to expire.  The inclusion of the required notice in all leases is a prerequisite to deregulation of each apartment at the end of the last lease entered into during the tax benefit period.

32.     Buildings subject to Section 421-a rent stabilization are *not subject to "high-rent vacancy deregulation,"* meaning the apartments in such buildings do not become deregulated once the legal rent exceeds a given threshold amount.

10

33.     The rent regulations of the RSL and RSC include several fundamental concepts that Defendants have violated through their scheme, including the following:

**"Legal Rent" Pursuant to "Rent Stabilization"**

34.     "Rent stabilization" means, among other things, that:

a.     A maximum legal regulated rent ("legal regulated rent" or "legal rent") is established for each apartment in a building that is subject to rent stabilization on the "base date" that the apartment becomes subject to rent stabilization;

b.     For existing units, the legal rent that a landlord may charge is based on the legal rent applicable to the previous tenant, and is subject to various adjustments; and

c.     For new construction, the initial legal rent *is the lower of* (i) the initial "legal rent" established by the New York City Department of Housing Preservation and Development ("HPD"); or (ii) the actual rent paid by the initial tenant.

**Additional "Legal Rent" for Individual Apartment Improvements ("IAIs") and Major Capital Improvements ("MCIs")**

35.     Landlords of rent-stabilized apartments may be entitled to increases in the legal rent where they have performed certain kinds of improvements  either for individual apartments ("Individual Apartment Improvements," or "IAIs") or building wide ("Major Capital Improvements," or "MCIs").

36.     Landlords who undertake IAIs may be entitled to increase the legal rent of a rent stabilized apartment in an amount equal to $1/40^{th}$ of the costs of those improvements per month, including installation costs but not including finance charges.  Landlords can make improvements (in contrast to corrections of construction and/or other defects) in an occupied apartment only upon written consent of the tenants in possession; no written consent is required for vacant units.  If tenants in possession do not agree to the improvements that the landlord offers, then no increase to that tenant's legal rent is permitted.  When a tenant timely challenges IAIs claimed by landlords (as a justification for the legal rent the landlord claims is applicable to

a unit), landlords of rent-regulated apartment buildings must demonstrate that the costs of the improvements are supported by adequate documentation.

37.     Landlords who undertake MCIs for residential apartment buildings subject to rent-regulation laws may be permitted to adjust the legal rent of the apartments in the building based on the actual, verified costs of the improvements, as submitted in an application to DHCR by the landlord within two years of the improvement(s) having been made.  The increase to the legal rent to which the landlord may be entitled equals $1/60^{th}$ of the cost of the improvements (per month), including installation but excluding finance charges, apportioned to each apartment based upon the size of each apartment (as measured in number of "rooms").  To be eligible for an adjustment to legal rent due to an MCI, the improvement must, among other things, be a new installation (in contrast to corrections of construction and/or other defects) for the operation, preservation, and maintenance of the building that directly or indirectly benefits all tenants and is deemed depreciable under the Internal Revenue Code.  If DHCR approves the MCI application, it also establishes the amount of the permissible adjustment to the legal rent.

**Renewal and Vacancy Leases**

38.     Upon expiration of any lease for a rent-stabilized apartment, landlords must offer existing tenants the option of a one-year or two-year renewal lease with the same terms and conditions as the expiring lease, except with respect to increases in the legal rent.  For renewal leases, modest increases to the legal rent are permitted in amounts established each year by the Rent Guidelines Board ("RGB").  Landlords of rent-stabilized units may not increase the legal rent for renewal leases by an amount more than that approved by the RGB for a one-year or two-year renewal term.

12

39.     Where tenants of rent-stabilized units are offered (but do not accept) lawful renewal leases, a "vacancy lease" increasing the legal rent by twenty percent (20%) may be offered to the new tenant but, thereafter, upon renewal, increases to the legal rent may only be made to the degree that they have been authorized by the RGB.

40.     Landlords of rent stabilized apartments have an obligation to inform tenants concerning how the maximum regulated rent was calculated, of the tenants' rights, and of the landlords' duties, including by providing tenants with statutorily required lease riders.  For all rent-regulated apartments:

> [A]n owner shall furnish to each tenant signing a vacancy or renewal lease, a rider in a form promulgated or approved by the DHCR, in larger type than the lease, describing the rights and duties of the owners and tenants as provided under the RSL including a detailed description in a format as prescribed by DHCR of how the rent was adjusted from the prior legal rent.… For vacancy leases, such rider shall in additional also include a notice of the prior legal regulated rent, if any, which was in effect immediately prior to the vacancy, an explanation, and in a format prescribed by DHCR, how the rental amount provided for in the vacancy lease has been computed above the amount shown in the most recent annual registration statement, as well as the prior lease, and a statement that any increase above the amount set forth in such registration statement is in accordance with the adjustments permitted by the Rent Guidelines Board and this code.

RSC §2522.5(c)(1) (McKinney).

**<u>Succession Rights</u>**

41.     Any "family member" of a rent-regulated tenant, including persons with certain familial-like ties, may have the right to a renewal lease and/or protection from eviction when a tenant dies or permanently leaves the apartment, provided that the family member has resided with the tenant as a primary resident in the apartment for at least two years immediately prior to the death of, or permanent departure from the apartment of, the prior tenant (one year for senior citizens).  The family member may also have the right to a renewal lease or protection from

eviction if he/she resided with the tenant from the inception of the tenancy or from the commencement of the relationship.

42. The term "family member" is defined as a husband, wife, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law, or daughter-in-law of the tenant. It also includes any other person(s) residing with the tenant in the apartment as a primary resident, who can prove emotional or financial commitment and interdependence between such person and the tenant.

**Landlords' Obligations And The Consequences If Landlords Do Not Meet Them**

43. Landlords of rent-stabilized apartments must maintain all essential services provided by the RSC, known as required services, which may include but are not limited to reasonable repairs, decorating and maintenance, the furnishing of light, heat, hot and cold water, elevator services, janitorial services, and removal of refuse. In addition, landlords must provide certain building-wide services, known as ancillary services, which may include garage facilities, laundry facilities, recreational facilities, and security, for which owners are not permitted to charge additional payments (except for security). Failure to maintain required services may entitle tenants to a reduction of the legal regulated rent.

44. Landlords are prohibited from harassing tenants of rent-regulated apartments for any reason; it is unlawful for "any owner or any person acting on his or her behalf, directly or indirectly, to engage in any course of conduct (including but not limited to interruption or discontinuance of required services, or unwarranted or baseless court proceedings) which interferes with, disturbs, or is intended to interfere with or disturb, the privacy, comfort, peace, repose or quiet enjoyment of the tenant in his or her use or occupancy of the housing

accommodation, or intended to cause the tenant to vacate such housing accommodation or waive any right afforded under the code."  RSC §2525.5; *see also* RSL §26-516.  It is also unlawful for any person to remove or attempt to remove a tenant because the tenant has taken or proposes to take any action authorized or required by the RSL, RSC, or any order of the DHCR.

45.    The RSC provides that "[a]ny owner who is found by DHCR … to have collected any rent or other consideration in excess of the legal regulated rent shall be ordered to pay the tenant a penalty equal to three times the amount of such excess," unless "the owner establishes by a preponderance of the evidence that the overcharge was not willful," in which case the penalty shall equal the amount of overcharge plus interest from the date of the first overcharge. RSC §2526.1.

46.    DHCR also has the authority to impose civil penalties against landlords of housing accommodations who knowingly violate the laws and regulations by charging illegal rents or harassing tenants.  In addition to any other penalties, it may impose a civil penalty up to $250.00 for each knowing violation of the RSL or RSC.  If DHCR finds a landlord "to have harassed a tenant to obtain a vacancy of a housing accommodation, the DHCR may impose … a penalty in the amount of up to $1,000.00 for a first such offense and up to $2,500.00 for each subsequent offense or for a violation consisting of conduct directed at the tenants of more than one housing accommodation."  RSC §2526.2(b)-(c); *see also* RSL §26-516(c)(1)-(2).

47.    Any landlord found to have overcharged a tenant may be assessed and ordered to pay the reasonable costs and attorneys' fees of the proceeding and interest from the date of the overcharge.

**B. <u>Section 421-a Tax Breaks</u>**

48.     Briefly stated, under Section 421-a of the Real Property Tax Law of the State of New York (N.Y. Real Prop. Tax Law §421-a) ("Section 421-a"), the New York State Department of Finance provides real estate developers with time-limited real property tax exemptions under Chapter 6 of Title 28 of the Rules of the City of New York (the "421-a Rules").  In exchange for the receipt of the Section 421-a tax breaks, developers commit to the construction of new, multi-family residential construction projects with rent stabilized units with rents that are regulated pursuant to the New York City Rent Stabilization Law (New York City Administrative Code Chapter §§26-501 *et seq.*) (the "RSL") and the New York Rent Stabilization Code (9 NYCRR §§2520 *et seq.*) (the "RSC").

49.     The Section 421-a tax exemption is currently the single largest tax expenditure program in New York City, presently costing the city $1.4 billion per year in reduced tax revenues.  It is projected to cost the city up to $7.1 billion within the next yen years.

50.     *The receipt of Section 421 tax breaks places a subject property under rent stabilization for the entire duration during which that property's developers receive the associated tax benefits*.

51.     Accordingly, rent stabilization, within the context of Section 421-a,[3] means that: (1) the legal regulated base rent for each apartment in the building is established by the New York City Department of Housing Preservation and Development ("HPD"); (2) landlords of buildings subject to Section 421-a must register the initial rent for each apartment with the New York City Department of Housing and Community Renewal ("DHCR"); (3) landlords are

_____

[3] There is another category of rent stabilization known as "J-51" rent stabilization, which is not pertinent to the allegations contained within this pleading.

obligated to offer tenants renewal leases, pursuant to which they may only increase the rents to the degree approved by the Rent Guidelines Board; (4) upon the decision of a tenant not to renew, landlords must provide prospective new tenants with truthful information concerning the rental history of the units; and (5) landlords must file annual registration statements with DHCR updating the rental history of the regulated units.

52.     With respect to the initial registration of the rent with DHCR, landlords must register each apartment with DHCR *at the lower of*: (a) the legal regulated rent; or (b) the actual rent paid by the tenant of each apartment.

53.     The rent registration information submitted by landlords to DHCR *is not verified* by DHCR even though that information is considered to be part of New York State's Public Record.

## FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

54.     As is described more fully below, Defendants have implemented a scheme to avoid the rent limitations (and other obligations) imposed upon landlords receiving Section 421-a tax benefits under New York rent stabilization laws, through: (1) falsely registering Court House as exempt from rent stabilization; (2) making false statements to government agencies in connection with establishing the initial legal rents applicable to initial tenants; (3) filing false initial rent registrations with government agencies; (4) filing false amended rent registrations with government agencies; (5) misrepresenting the initial legal rent to the initial tenants; (6) misrepresenting to the initial tenants at lease renewal time the legal rent increases purportedly applicable to renewal leases; (7) coercing tenants into vacating apartments by demanding unlawful rent increases based upon misrepresentations concerning the applicable legal rent and the rent history of the units; (8) extorting unlawfully high rents from tenants upon renewals and

vacancies; (9) misrepresenting the costs of IAIs and MCIs; (10) misrepresenting repair of construction and other defects as "improvements" entitling Defendants to increases in the legal rents; (11) misrepresenting tenants' succession rights; and other means, including by means of: (1) mail fraud (18 U.S.C. §1341); (2) wire fraud (18 U.S.C. §1343); (3) extortion (18 U.S.C. §1951) and (4) obstruction of justice (18 U.S.C. §1503). Defendants' conduct constitutes acts of artifice or deceit which are intended to deprive tenants of their property rights (in their leaseholds) and of money (rent).

**Defendants' Pattern of Racketeering Activity**

55.    As set forth herein, Defendants formed an enterprise consisting of an association-in-fact (the "Walentas Enterprise") and conspired to: (i) conduct an unlawful (and unilateral) *de facto* deregulation of their rent-stabilized properties; (ii) inflate rents over and above the amounts they are legally permitted to charge under New York's rent-stabilization laws; (iii) to force tenants to vacate apartments so that rents could be raised twenty percent (20%) due to purported "vacancy leases" when the vacated units were rented out to new tenants; and (iv) to unlawfully take advantage of Section 421-a tax benefits *expressly conditioned* on the provision of rent-stabilized housing to tenants.

56.    In perpetrating their scheme, Defendants committed unlawful acts including: (a) filing false information with governmental agencies in connection with the computation of the initial rent of units subject to rent-stabilization; (b) filing false registration statements and amended registration statements with governmental agencies which falsely represented that registered units were "exempt" from rent stabilization; (c) making false and fraudulent statements through the U.S. Mail and wires; (d) unlawfully coercing and harassing rent stabilized tenants into vacating their apartments; (e) unlawfully extorting inflated rents from tenants upon

lease renewal; and (f) obtaining Section 421-a tax benefits without subjecting their property to rent stabilization and its corresponding limitations on initial rents and rent increases.

57.     Defendants engaged in a pattern of racketeering activity by committing numerous predicate acts, including multiple instances of mail and wire fraud, through coercion, extortion, and obstruction of justice.  As a result, Defendants have engaged in a long-term, continuous, organized pattern of racketeering conduct by which they submit false statements of the legal regulated rents in their property registrations, fail to truthfully and accurately update statements of the legal regulated rents in their property registrations, unlawfully inflate base legal regulated rents, unlawfully inflate rent increases upon the termination of leases, unlawfully overcharge tenants who move into their buildings and/or who renewed their leases, and unlawfully coerce those who cannot afford the unlawful rent increases into moving out of the building.

58.     In perpetrating their conspiracy, Defendants and their associates used public money to develop rental properties in Brooklyn and also collected millions of dollars of public subsidies in the form of Section 421-a tax breaks that they never legally qualified for, simultaneously exploiting tenants through rent gouging, illegal evictions, and forced and involuntary displacement.

59.     All the while, government entities and elected officials -- influenced no doubt by campaign contributions made by Defendants and their associates[4] -- failed to enforce, for tenants, the benefits that were express conditions to the 421-a tax breaks exploited by Defendants.  Indeed, executives representing both the New York City Department of Housing Preservation

---

[4] It is a matter of public record that seven developers, wrote checks totaling $245,000 to Mayor Bill de Blasio's Campaign for One New York before de Blasio announced plans for a streetcar along the Brooklyn waterfront, with stops near the developers' projects, including $100,000 from Defendant Jed Walentas.  *See Mayor de Blasio denies pay-to-play links to developers in streetcar plan*, NEW YORK DAILY NEWS December 12, 2016, available at http://www.nydailynews.com/news/politics/de-blasio-denies-pay-to-play-developers-streetcar-plan-article-1.2908395, last checked January 17, 2016.

and Development and New York City's Department of Finance confirmed, in testimony under

oath given during a City Council hearing on November 22, 2016, that they *knowingly* decided

not to enforce the rent stabilization requirements associated with the Section 421-a tax breaks in

order to accommodate the wishes of developers, including Defendants.[5]

## Because Defendants Obtained Section 421-A Tax Breaks, Court House is Subject to Rent Stabilization for the Duration of the Tax Benefits Received (*i.e.* 25 Years)

60.     Defendant 125 Court owns Court House, a 321-unit residential rental property,

located at 125 Court Street on the corner of Court Street and Atlantic Avenue in Brooklyn, New

York ("Court House").  125 Court purchased the land upon whichCourt House was constructed

from the City of New York in 2003 for $16.5 million dollars.  The property is managed by

Defendant Two Trees and was constructed by Defendant 30 Main.   These entities are all

associates of Defendants David Walentas and Jed Walentas, respectively, and the Walentas

Defendants have financial interests in those entities.

61.     Court House was constructed between 2003 and 2005, utilizing over $92 million

dollars of public money provided by the New York City Housing Development Corporation

("HDC") (later refinanced by HDC in an amount over $104 million), with the benefit of a

twenty-five (25) year phased exemption from real estate taxes (up to 3 years for construction,

and 22 years thereafter)) in accordance with Section 421-a of the Real Property Tax Law of the

State of New York.  The Section 421-a exemption required that all residential units be subject to

---

[5] See City Council Joint Committee on Housing and Buildings and Finance Hearing, New York City Department of
Finance, Testimony of Timothy Sheares, Deputy Commissioner, Property Division, dated November 22, 2016, at 2
("Under an informal Bloomberg Administration agreement between HPD and [the NYC Department of Finance],
beneficiaries [of 421-a tax benefits] with only a [Preliminary Certificate of Eligibility for 421-a benefits] received
post-construction benefits prior to the actual issuance of the [Final Certificate of Eligibility].".

rent regulation for 25 years in accordance with the New York City Rent Stabilization Code.[6]
Moreover, the public funding provided by HDC was unavailable to developers unless they
offered the public benefits of affordable and rent-stabilized housing to local communities (and
the twenty-five year duration of the 421-a tax benefits were expressly conditioned on the
provision of affordable housing).

62.     In connection with construction of Court House, on or about December 3, 2003,
Defendants 125 Court, 30 Main, DW Associates and David C. Walentas signed a Regulatory
Agreement with the New York City Housing Development Corporation obligating Defendants to
subject Court House to rent stabilization for the duration of receipt of Section 421-a benefits
(twenty-five (25) years).  The Regulator Agreement stated, in pertinent part:

> 7.2 (a) Due to the Project's expected receipt of Real Property Tax Benefits, ***all
> units in the Project are subject to Rent Stabilization during the period the
> Project is receiving such Real Property Tax Benefits***.  After the expiration of
> Rent Stabilization, if the Occupancy Restriction Period is still in effect, rentals
> of vacated Low Income Units shall be regulated in a manner consistent with
> Rent Stabilization for so long as may be required by the provisions of this
> Agreement, pursuant to a contract between HDC and the governmental agency
> administering Rent Stabilization and consented to by the Mortgagor
> ("Contractual Rent Regulation").  ***The Mortgagor shall enter into any
> agreements with any agency administering Rent Stabilization necessary to
> implement such Contractual Rent Regulation***.

> (b) ***The Mortgagor shall comply with all applicable requirements of any
> governmental agency administering Rent Stabilization or Contractual Rent
> Regulation for so long as required by Rent Stabilization, the  program
> granting Real Property Tax Benefits to the Project, or this Agreement***;
> provided, however, nothing in this Section 7 shall be deemed to require
> compliance with any provision of Rent Stabilization or Contractual Rent
> Regulation inconsistent with the requirements of this Agreement, including,
> without limitation, those requirements with respect to continuous occupancy by

---

[6] In addition, Defendants also received an allocation of low-income housing tax credits in connection with
construction of the Building.

tenants qualified as Low Income Tenants and restrictions on subletting by Low Income Tenants.

December 3, 2003 Regulatory Agreement, ¶¶7.2(a)-(b) (emphasis added).

63.     The tenants of Court House are third-party beneficiaries of the December 3, 2003 Regulatory Agreement.

## Defendants Falsified Information Provided to HPD for the Purpose of Inflating Initial Rents

64.     On or around December 2004, Defendants submitted: (i) an application for a preliminary certificate of eligibility for Section 421-a Benefits (the "Application"); and (ii) a Schedule of Initial Rents listing proposed rental initial amounts for all units in Court House, to the HPD Division of Housing Finance for approval.

65.     Pursuant to Chapter 6 of Title 28 of the Rules of the City of New York (the "421-a Rules"), HPD determines both eligibility for Section 421-a real property tax exemptions and the initial rents of units in the subject property.  Pursuant to §6-04 of the 421-a Rules, "No certification of eligibility shall be issued by the Department until the Department determines the initial adjusted monthly rent to be paid by tenants residing in rental dwelling units contained within the multiple dwelling.  Except for affordable units, the initial adjusted monthly rent is determined in accordance with the provisions in paragraph (3) below."  Paragraph (3), in turn, provides a formula to be used by HPD for determining the initial adjusted monthly rent per "room" (as that term is defined in the 421-a Rules) based on inputs provided by the applicants for Section 421-a benefits, including the "total expenses," which are effectively expenses after the deduction of estimated revenues.  Section §6-04 of the 421-a Rules defines "total expenses," stating, in pertinent part:

>The total expenses of the multiple dwelling shall be determined by the Department in order to calculate the initial adjusted monthly rent.  ***Total expenses shall mean the annual total of the following***:

(i)    An amount for the annual cost of operation and maintenance, as established pursuant to the Annual Schedule of Reasonable Costs; plus,

(ii)    An amount for vacancies, contingency reserves and management fees as established pursuant to the Annual Schedule of Reasonable Costs; plus,

(iii)    Projected real property taxes to be levied on the multiple dwelling and the land on which t is situated at the time of estimated initial occupancy; plus,

(iv)    Fourteen percent of the total project cost, as determined pursuant to §6-05(b)(1)(i) and the Annual Schedule of Reasonable Costs, which amount will include debt service; *less*,

(v)    ***The estimated annual income to be derived from any Floor Area of Commercial, Community Facilities, and Accessory Use Space in the multiple dwelling***.

§6-05 of the 421-a Rules (emphasis added).

66.    Defendants falsified the reported total expenses of Court House in the Application, including its subcomponents.  For instance, Defendants made false statements concerning the parking revenue associated with 700 parking spaces in Court House.  Defendants fraudulently represented to HPD that revenue for all 700 parking spaces would amount to only $72,500 a year, or $104/year per parking space (a mere $8.63 per month per parking space), grossly understating revenues.

67.    Defendants fraudulently represented to HPD, in the Application, that Court House would have ***$221,703 per month*** in administrative costs (i.e. $691/month ***per unit***), falsely overstating expenses.

68.    Defendants also fraudulently misrepresented to HPD, in the Application, the expected revenue from commercial space on the Court House property.  Defendants stated that the 18,307 square feet of commercial space in Court House would result in annual revenue of

23

only $22,500, which is only $1.23 per square foot per year. Defendants statements were intentionally false because Defendants had actual knowledge of the market value of commercial space in Brooklyn and of the expected annual revenues of commercial space supporting the market value of the space.

69.     Defendants also fraudulently understated revenue, in the Application, from: washing machines installed at Court House, provision of cable, wifi, and other services.

70.     Defendants submissions to HPD, including the Application, intentionally contained falsified figures concerning the total expenses of Court House. The figures Defendants supplied to HPD in their written submissions, including the Application, knowingly and falsely overstated total expenses (including by understating Court House revenues) for the purpose of obtaining HPD approval of higher initial rents than HPD would have otherwise approved if HPD had been provided with truthful and accurate accounting figures. Because HPD determines initial rents in accordance with a formula that considers the total revenues (including by factoring into the calculation a deduction for revenues) of a property, Defendants' provision to HPD of falsely overstated total expenses (and falsely understated revenues) was intended to, and did in actuality, result in HPD approving higher initial rents for Court House than would have been approved by HPD based upon truthfully reported total revenues and expenses.

71.     Defendants were required to submit to HPD a CPA Certification of Actual Development Costs from Defendants' auditors concerning the total actual development costs associated with construction of Court House, but the opinion they submitted to HPD was ***not signed and notarized***.

72.     Defendants submitted the fraudulent Application to HPD ***using certified mail.***

73.     Defendants submitted the fraudulent Schedule of Initial Rents to HPD ***using certified mail.***

74.     On or about March 18, 2005, Defendants received preliminary approval for 421-a tax benefits.  The Preliminary Certificate of Eligibility expressly stated:

> ***Based upon the information contained in the Application for Preliminary Certificate of Eligibility*** for Partial Tax Exemption filed 12/09/2004 and a determination by the Commissioner, the applicant, pursuant to Section 421-a of the Real Property Tax law and the 421-a Rules of the Department of Housing Preservation and Development issued pursuant thereto, is hereby granted this Preliminary Certificate of Eligibility for Partial Tax Exemption for the above premises…. ***This Certificate is conditioned upon the filing and approval of a Final Application*** to be submitted to the Department of Housing Preservation prior to initial occupancy (for multiple dwellings owned as a rental) and prior to the first taxable status date following completion of construction (for multiple dwellings owned as a co-op or condo), and the submission of a temporary or permanent certificate of occupancy issued by the Department of Building as evidence of the fact that the structure was completed.  It enables the property to benefits while under construction for up to three years.  It is the applicant's responsibility to complete the necessary filing in order to obtain a Final Certificate of Eligibility.  This Certificate must be filed with the New York City Department of Finance immediately upon issuance.

Preliminary Certificate of Eligibility (emphasis added).

75.     In order to be entitled to the Section 421-a tax benefits, Defendants were obligated to follow-up by timely filing and obtaining a Final Application for Partial Tax Exemption under the program on or about the time that Court House received its Certificate of Occupancy.  Defendants failed to do so, and, accordingly, never met the requirements to entitlement to the Section 421-a tax benefits.

76.     Nevertheless, despite granting the Preliminary Certificate of Eligibility, in a March 25, 2005 letter to Defendants, HPD stated:

> Your submitted summary of proposed initial rents reflecting an average per room per month of $1029.03 is approved.  You may set your individual

apartment rents to suit your marketing needs, but the maximum gross monthly rental for your apartment [building] may not exceed $1,154,054.00.

Prior to the completion of your project, events may occur necessitating an increase in your initial rent scheduled.  This office must be advised of these changes, and documentation must be submitted in advance in support of such changes.  Initial rents may not be increased after the issuance of a Final Certificate of Eligibility except as the law permits.

***In the case of rental properties, the first rent becomes the base rent for all future increases submitted by New York City Rent Guidelines Board.  A copy of the HPD Approved rent schedule must be attached to all initial leases.  All multiple dwellings receiving 421-a benefits must register with the NYS Division of Housing and Community Renewal to enjoy the benefits of the 421-a program.  The initial and each successive owner must maintain membership of the property for the entire period the property is receiving 421-a benefits.***

March 25, 2005 letter from HPD to Defendants (emphasis added).  Defendants did not adhere to the requirements communicated to them by HPD.

77.     The Schedule of Initial Rents that Defendants submitted to (and approved by) HPD contains a legend (emblazoned on it by HPD) stating:

Prior to the issuance of a Certificate of Eligibility HPD must determine the initial adjusted monthly rent for the building and the initial adjusted monthly rent per room (see Sec. 6-04 of the 421-a Rules).  Owners of 421-a buildings must insert in every lease a notice to the tenant that a 2.2% increase may be charged in addition to the rent increases approved by the New York City Rent Guidelines Board.  ***All dwelling units located in 421-a buildings are subject to rent stabilization for the tax benefit period***; and all leases must contain a notice in at least 12 point type informing the tenant the deregulation date of the unit covered by the lease.

Schedule of Initial Rents (emphasis added).

78.     Pursuant to Rent Stabilization, Defendants were obligated to register each apartment in Court House with DHCR at the lower of: (i) the legal regulated rent (as approved by HPD) or (ii) the actual rent paid by the initial tenants.

79.     Defendants falsely registered the apartments with DHCR, at rents that were far in excess of the lower of: (i) the legal regulated rent (as approved by HPD), or (ii) the actual rent paid by the initial tenants.

80.     Defendants were also required, ***upon occupancy***, to submit an Initial Registration Rent Roll Report ("Initial Rent Registration") to DHCR indicating the rent actually charged to each tenant of each occupied unit in Court House.  Defendants' submission to DHCR listed 256 of the units in Court House as "exempt" from rent stabilization.  <u>None</u> of the units were legally exempt.[7]

81.     Defendants admitted in their 2005 Bond Offering documents that initial occupancy of the residential units commenced in March 2005 and that since August 2005, the month in which full occupancy was achieved for the Project, approximately 99% of the apartments have been occupied.  Accordingly, they should have made all their initial registration submissions to HPD by no later than August 2005, but they did not do so.

82.     Defendants sent copies of the Initial Rent Registration to each of the initial tenants ***<u>by certified mail</u>***, and, as set forth below, these mailings were fraudulent.

<u>**The Heart of The Fraud**</u>

83.     The Initial Rent Registrations sent to each initial tenant by certified mail were fraudulent.  First, the Initial Rent Registrations falsely misrepresent that the units are "Exempt" from rent stabilization due to, purportedly, "High-Rent, Vacancy Deregulation."  Under New York law, the units are neither exempt nor subject to high-rent vacancy regulation.  Second, the

---

[7] Defendants financed construction of Court House using public funds earmarked for "rent stabilized" and "affordable" housing in what is colloquially known as "80-20 financing."  For Court House, this means 80% (*i.e.* 256) of the 321 units are subject to rent stabilization and the other 20% (*i.e.* 64 units, with one additional unit reserved for the building superintendent) are subject to both rent stabilization <u>and</u> affordable housing regulation, requiring that the units be affordable to tenants with incomes below certain threshold levels in comparison to the average median income of the geographical area.

Initial Rent Registrations were fraudulent because while they purport to disclose to tenants the "legal registered rent," they falsely inflated the stated legal rents to amounts far in excess of the amounts that HPD approved.  Third, the Initial Rent Registrations purport to disclose to tenants the "Actual Rent Paid" and falsely state that those actual rents were "preferential," when they were not.  Under New York law, "preferential" rents are reduced rents charged by landlords as concessions to tenants for a specified time period, where landlords would otherwise have the legal right to charge higher rents up to the maximum legal registered rent.  Further, landlords have the right to charge that higher legal registered rent upon expiration of the concession, provided that the legal registered rent has been previously, and lawfully, established in prior leases.  Here, Defendants' did not have the right to charge the higher purported legal registered rents stated in the Initial Rent Registrations because they never lawfully established the purported legal registered rents.

84.     The use of the purported "preferential" rent, in relation to the purported legal registered rent, created a spectrum of potential rents that Defendants could charge tenants. Tenants had no choice but to reply upon Defendants' statements, because Defendants were falsifying the very documents (indeed, the only documents) to which tenants could resort to verify Defendants' claims (concerning the applicable legal registered rent and the actual rents).

85.     Further, as set forth above, the HPD-approved rents -- upon which the Initial Rent Registrations were premised -- were already artificially inflated because they were obtained fraudulently by Defendants through false and misleading statements made to HPD concerning the total expenses (after taking into account revenues) of Court House.

86.     Defendants' fraudulent Initial Rent Registrations were a knowing and intentional attempt to unlawfully deregulate Court House from rent stabilization.   Defendants then

28

bootstrapped their false statements concerning the legal registered rents and actual rents paid by writing the fraudulent legal registered rents into the terms of tenants' initial <u>and</u> renewal leases. Defendants further compounded the fraud by applying RGB approved rent increase percentages to the already artificially inflated purported legal rents.

87.     By way of example only, the HPD-approved initial rent for rent stabilized apartment 7SF was $6570 as reflected on the Schedule of Initial Rents.  The Initial Rent Registration falsely states that the legal regulated rent for the unit during the 2006-07 lease term was $10,976.09, and that the actual rent paid was $4100.  The Initial Rent Registration falsely states that during the 2008-09 lease term the legal regulated rent increased to $14,850 and the actual rent paid was $4,200.  This amounts to an increase of $3874, a ***whopping 35% increase*** over the already fraudulent inflated purported legal rent for 2009.  In contrast, the RGB-approved increase for the relevant period was 4% for a one year lease and 8% for a 2 year lease renewal and even with a "vacancy increase" the maximum amount the legal rent could have increased would have been only 20%.  The figures listed in the Initial Rent Registration were intentionally false statements and the purported legal rents were arbitrarily selected by Defendants with no way for the tenant to know that Defendants' calculations were falsified.  The fraudulent statements in the Initial Rent Registration provided Defendants with the basis for a colorable legal claim that they could charge a tenant up to $14,850 a month for this two-bedroom apartment.  Defendants made similar falsifications for all of the other rent stabilized units in Court House.

88.     Despicably, Defendants even perpetrated this fraud upon the low-income tenants of the units designated as "affordable housing," meaning they were inhabited by households earning incomes substantially below the average medium income of the neighborhood.  For

instance, the Initial Rent Registration falsely states that the legal regulated rent for unit 2NA during 2005-2007 was $706/month, while the HPD-approved amount was only $652/month, which was also the amount actually paid by the tenant (according to the Initial Rent Registration).  Accordingly, the correct legal rent for the unit was only $652/month (*i.e.*, the lower of the HPD-approved rent or the actual rent paid).  The Initial Rent Registration reflects that the purported legal rent increased from $652 to $706/month for the 2007-08 lease term, an increase of 8.2%.  The Initial Rent Registration reflects that actual rent increased to $688.82 for the 2007-08 lease term, an increase of 5.64%.  In contrast, ***the RGB-approved increase for this 1 year lease renewal was only 4%.  Defendants fraudulently increased the purported legal rent by more than double the lawful amount***.

89.     The figures listed in the Initial Rent Registration were intentionally false statements and the purported legal rents were arbitrarily selected by Defendants with no way for tenants to know that Defendants' calculations were fraudulent.  Defendants made similar falsifications for all of the other affordable housing units in Court House.

90.     In this way, Defendants laid the foundation for presenting all subsequent tenants with falsified rental histories.  Those falsified histories falsely show that: (i) each prior tenant was receiving a preferential rent; (ii) the landlord was legally entitled to charge each prior tenant a (falsified) higher regulated legal rent than the purported preferential rent the landlord claimed to have charged; and (iii) that the landlord was entitled to charge each new tenant a new rent based on an increase above the maximum legal regulated rent the landlord could have charged the prior tenant when, lawfully, the landlord was only entitled to base the new rent on the actual rent paid by the initial tenants (which was lower than the purported maximum legal rent).

30

91.     Because landlords must register each apartment's initial rent with DHCR *at the lower of*: (a) the legal regulated rent; or (b) the actual rent paid by the tenant of each apartment, the Legal Regulated Rents reported in the Initial Rent Roll are fraudulent.

92.     Defendants stood to benefit financially from their fraudulent scheme by receiving inflated rent payments and profits from the increased rents and from the conversion of Court House from a rent stabilized building to one that was, *de facto,* not subject to rent stabilization. Defendants, as controlling members of the Walentas Enterprise, were in a position to carry out their plans by negotiating leases, sending rent bills, determining when to file rent registrations and amended registrations, and determining their respective contents.  Defendants' acted in bad faith by failing to file proper rent registration statements even after being informed that they were in non-compliance, by communicating to tenants that Court Street was not subject to rent stabilization when they had actual knowledge that it was subject to rent stabilization, and by failing to adjust rents to comply with HPD-approval even after being advised that they were non-compliant.

93.     On or about June 14, 2011, HPD sent Defendants' a letter stating that Defendants' application for 421-a Partial Tax Exemption benefits "is incomplete or contains inconsistencies…."  The letter went on to state:

> All units must be registered as rent stabilized with DHCR.  ***256 units are currently listed as 'exempt'***.  This is not allowed.  ***In addition, the rents registered are above the HPD approved amount***.  Please revise your DHCR registration so the rents are within HPD guidelines and all units are rent stabilized.

June 14, 2011 HPD letter (emphasis added).

94.     On or about June 4, 2012, HPD sent Defendants a follow-up notification that Defendants' application for 421-a Partial Tax Exemption benefits still was "incomplete or contains inconsistencies."  The letter went on to state:

> According to our records, the building was completed on 02/21/2006; however, DHCR records indicate that the registration is incomplete (***all units are not registered as rent stabilized***, some are registered as "expempt" [sic], ***rents registered are above the HPD approved amount*** etc.).  As per the 421-a rules and regulations, y***ou need to file the initial DHCR registration upon occupancy of the building & an annual registration thereafter*** for every year that you are receiving 421-A benefits.  Are these buildings occupied and rent stabilized? Please have the owner explain.  ***Please revise your DHCR registration so the rents are within HPD guidelines & all units are rent stabilized & provide proof of complete/correct Initial Registration***, which includes forms RR-1(i) for each unit, RR-2(i) & RR-3(i) as well as annual registration, which includes the Annual Apartment Registration form for each unit & the Annual Registration Summary for the building for every year from the occupancy up until the current year.  Please note, we will not continue processing your Final application until rent registration is resolved…."

June 4, 2012 HPD letter (emphasis added).

95.     Despite the June 14, 2011 and June 4, 2012 notifications from HPD concerning Defendants' improper rent registrations, Defendants failed to cure the falsely stated registered legal rent amounts.  Instead, on February 21, 2006, August 3, 2006, May 14, 2008, May 30, 2008, July 29, 2008, July 30, 2009, August 1, 2009, July 28, 2010, July 25, 2011, and September 11, 2013, Defendants submitted false and fraudulent Amended Registration Rent Roll Reports ("Amended Rent Registrations") to DHCR and copies to the tenants ***using certified mail***.  All told, ***Defendants sent DHCR and the tenants more than 2500 fraudulent Amended Rent Registrations using certified mail***.  These Amended Rent Registrations were false and fraudulent because, like the Initial Rent Registration sent to the tenants (also by certified mail), they knowingly, falsely, stated: (i) the purported legal rents (inflating them); (ii) the purported actual rents paid (which were also falsely stated); and (iii) falsely claimed that the apartments

were subject to "high rent vacancy" decontrol.[8]   These statements were knowingly and intentionally false.   A comparison of the actual leases of the tenants of Court House, cross-referenced against the rent invoices, rent checks, Initial Rent Registration and Amended Rent Registrations will reveal the fraudulent nature of Defendants' submissions to DHCR and their communications to tenants.

96.     Defendants: (i) failed to attach a copy of the HPD Initial Schedule of Rents with the leases provided to initial tenants; (ii) did not timely and correctly file Amended Rent Registrations with DHCR; (iii) did not timely submit a Final Application for Section 421-a tax benefits; and (iv) did not secure a Final Certificate of Eligibility to qualify for receipt of Section 421-a tax benefits, at least as of 2015.   Nevertheless, Defendants availed themselves of the Section 421-a tax breaks (in excess of $10 million) and, to date, have neither paid the wrongfully abated taxes nor complied with the rent stabilization requirements that the tax breaks are conditioned upon.

97.     Additionally, commencing with the initial leases and continuing through present, Defendants, through 125 Court and Two Trees, entered into leases with Plaintiffs and members of the purported Class which falsely stated that the apartments were subject to maximum legal rents that were knowingly and falsely inflated in the lease documentation and related riders.

98.     Defendants, through 125 Court and Two Trees, provided tenants with "Preferential Rent Concession Riders" that falsely stated that the rents paid by tenants, including the initial tenants, were at "preferential" rental rates (reflecting temporary concessions) below the maximum legal rents allowed under rent stabilization.   In actuality, by operation of law, the

---

[8] The Amended Rent Registrations also show that Defendants violated the rent regulations by unlawfully renting units to Churchill Corporate Services, a provider of furnished corporate housing and short-term furniture rental services.

maximum legal rent for a unit is based on the lower of: (i) the legal regulated rent approved by HPD or (ii) the actual rent paid by the initial tenants.  Accordingly, statements made to tenants in the Preferential Rent Concession Riders that the legal regulated rents for the apartments were higher than the "preferential" rents, were knowingly false.

99.     While a landlord is allowed to charge tenants a preferential rent that is less than the maximum legal rent, there are preconditions to doing so: (1) there must be a preferential rent rider that expressly states the term of the preferential rent; (2) the legal rent must have been lawfully established.  Defendants' leases failed each of these criteria.  By definition, there can be no "preferential rent" in an initial lease; yet Defendants' initial leases fraudulently purported to establish maximum legal rents in excess of the actual rents paid, and specifically referred to the actual rents paid as "preferential rents" when they were maximum legal rents, by operation of law.

100.     Defendants initial leases issued to tenants falsely and fraudulently omitted that the apartments were subject to rent stabilization and the amounts of the maximum legal rents approved by HPD, which were required by law to be stated within the leases.

101.     Defendants were required to send copies of the Initial Rent Registration to each initial tenant by *certified mail*.  Defendants sent the Initial Rent Registration by certified mail to each tenant, but the Initial Rent Registration was fraudulent because it included knowingly false statements about the maximum legal rent and actual rents paid, and the rent stabilized status of the apartments, as described above.

102.     Defendants used these statements about the maximum legal rents, which they had knowingly and falsely inflated, as described above, to justify unlawfully high rent increase demands to tenants at the termination of those tenants' leases.

103.   When tenants objected to the unlawfully high rent increases demanded by Defendants, tenants were falsely told: (i) that their apartments were not rent stabilized; (ii) that they had been receiving preferential rents and the landlord had the power to raise the rent to the (falsely claimed) maximum legal rent; (iii) told that they had no right to renew at the increased rates specified by the Rent Guidelines Board for one and two year lease periods.

104.   Defendants conspired to unlawfully inflate the initial rental amounts, and the renewal rent demands, in order to coerce tenants into either paying higher amounts, or to vacate the property, so that Defendants could charge new tenants moving into the vacated units a 20% "vacancy increase."   Had Defendants calculated the proper rents according to the law, they would only be able to increase tenants' rents in the amounts approved by the Rent Guidelines Board (typically only a few percentage points), measured from the lawful registered rent amounts.  Instead, Defendants demanded that tenants pay rent increases of twenty percent (20%) or more.

105.   As a result of Defendants' unlawful actions, hundreds of tenants throughout Court House have been provided with illegal leases, charged unlawful rent increases, and coerced into moving out of their apartments.

106.   Indeed, between 2005 and 2013, Court House had a tenant turnover approaching 300%, which is practically ***unheard of*** for a building subject to Rent Stabilization.  According to an HPD report, rent stabilized tenant turnover citywide for the same period was a mere 30%. Between 2013 and 2015, alone, Court House had 31 evictions (out of only 351 units).  As a result, Defendants were able to apply the 20% vacancy rate increase many times over, unlawfully increasing purported maximum legal rents for Court House.

35

### *Defendants' Racketeering Enterprise*

107.    The "Walentas Enterprise" identified herein is an association-in-fact consisting of the Defendants, including David Walentas and Jed Walentas, and their LLCs, partners, principals, agents and other associates who act as instrumentalities of the Walentas Enterprise for the purpose of executing the pattern of racketeering set forth herein.   Each member of the Walentas Enterprise has operated as part of an association-in-fact, and has been free to act independently and advance its own interests, contrary to those of the other members of the enterprise.   Indeed, purely by way of example, 30 Main asserted various construction liens against certain of the other Defendants in connection with the construction of Court House, as reflected in the offering document for the 2005 bonds offered by New York City Housing Development Corporation for the purpose of refinancing Defendants' mortgage on Court House.

108.    Defendants David Walentas and Jed Walentas, and their partners and associates, manage and operate numerous properties throughout New York City in which tenants on whose behalf plaintiff 421-a Tenant Association advocates live, including Court Street, where plaintiffs Scrivo and Lebed reside.

109.    Defendants David Walentas, Jed Walentas, and various LLCs, limited partners, and other agents and operatives associated with the Walentas Defendants form an enterprise that is an association-in-fact for the purpose of developing New York City apartment buildings using public funds, obtaining Section 421-a tax breaks which subject units in the buildings Defendants develop to rent stabilization, and then surreptitiously using "self-help" to unlawfully deregulate the rent stabilized units.

110.    The Walentas Defendants managed the day-to-day operations of the Walentas Enterprise, including negotiating leases, billing for and collecting rent, hiring and supervising

building staff, making repairs, supervising capital improvements, sending delinquency notices and eviction notices, and commencing eviction proceedings.  At least some of these functions are done through 125 Court and through Two Trees.

111.    Defendant David Walentas, as a founder, investor, and owner of Defendant Two Trees, has had principal authority and responsibility for directing the Walentas Enterprise and for overseeing its operations.  Upon the elevation of Defendant Jed Walentas to the position of Chief Executive Officer of Defendant Two Trees, principal authority and responsibility for directing and overseeing the Walentas Enterprise's operations passed to Defendant Jed Walentas.

112.    To facilitate their pattern of racketeering, Defendants have conducted the Walentas Enterprise's affairs through a scheme involving a variety of illegal acts, all intended to increase regulated rents beyond the legal limit and to drive rent-regulated tenants to vacate their apartments.  Those illegal acts, at least some of which were performed through 125 Court and Two Trees, respectively, include, without limitation, the following:

**Misrepresenting the Legal Rent**

113.    The base from which a rent-regulated tenant's payments are calculated is the historical legal rent for a given apartment.  Defendants have engaged in a pattern and practice of: (i) falsifying information provided to HPD for the purpose of calculating the initial legal rents applicable to units in Court House; (ii) filing false Initial Rent Registration statements and Amended Registration Statements with government agencies, including the DHCR, that falsely misrepresent the legal rents applicable to rent-stabilized apartments and that falsely claim the units are exempt from rent stabilization or are subject to high-rent vacancy decontrol; (iii) making false statements and misrepresentations to tenants in connection with demanding unlawfully high rents for renewal leases in order to coerce tenants into moving out of their

apartments so that Defendants could demand twenty percent (20%) rent increases under the guise of offering new tenants "vacancy leases"; (iv) making false statements and misrepresentations to tenants concerning the historical legal rents associated with apartments; (v) making false statements and misrepresentations to tenants concerning the amounts of rent actually paid by prior tenants and concerning the accurate computation of legal rents associated with prior leases. Defendants made these false statements and misrepresentations intentionally, with actual knowledge of the falsity of the statements and/or with reckless disregard for the truth.

**Baseless Eviction Proceedings**

114.   Defendants engaged in a pattern and practice of commencing eviction proceedings for which there was no proper legal basis as a strategy for evicting tenants or harassing them so that they would not seek to renew their leases and so the Walentas Enterprise could demand twenty percent (20%) rent increases under the guise of offering new tenants "vacancy leases.  In many cases, the tenants could not afford legal counsel and were required to appear *pro se* or seek to obtain *pro bono* legal representation.  In addition, appearing in court to oppose the baseless eviction proceedings required tenants repeatedly to take time off from their jobs, which they could ill afford and which in some cases caused them to forgo wages.  In some cases, tenants were unable to take time off work or obtain related child care and were unable to attend scheduling hearing dates, placing them at risk of losing by default even though Defendants' proceedings were meritless.

115.   Defendants' eviction program is aggressive.  Indeed, as set forth above, between 2005 and 2013 Court House had a tenant turnover approaching 300% and between 2013 and 2015, alone, Court House had 31 evictions (out of only 321 units).

38

116.    An examination of the HPD website for Court House shows a history of long uncorrected violations.  Where such violations exist, tenants have the right to withhold rent until repairs are made.  But rather than make repairs, Defendants have adopted a pattern and practice of filing unwarranted eviction proceedings misrepresenting that rent was due and had not been paid.  In connection with those proceedings, Defendants made false statements concerning the amount of the legal rent and concerning the rent histories of the apartments at issue.

**Extortion**

117.    Defendants engaged in a pattern and practice of sending "30 Day Notices" and "3-Day Notices" to tenants, claiming that rent was due when it was not, and falsely stating the amount of rent purportedly due and demanding payment in order to cure the default before the commencement of eviction proceedings.  Defendants committed extortion by sending tenants such notices when no rent was actually overdue, for example because the tenant was entitled to withhold rent in connection with necessary repairs which had not been made, and making false statements concerning the amount of the legal rent and concerning the rent histories of the apartments at issue.

118.    Defendants count on the tenants' concern about losing their homes and about the difficulty of finding another rent stabilized apartment to coerce the tenants into paying unlawful rent increases in connection with renewal leases.  Defendants further count on tenants' concern that they will be blacklisted by other landlords, once they are named as parties in Housing Court proceedings, to ensure that tenants will not contest Defendants' unlawful rent increases.  Because it is common practice in New York City for landlords to purchase lists of parties to Housing Court proceedings in order to avoid renting to "undesirable" tenants, there is a chilling effect in place that prevents tenants from asserting their rights.

**Blocking Succession Rights**

119.    As noted above, the applicable rent regulations and laws require landlords to provide regulated rents to family members and other cohabitants of a tenant who succeed to the original tenant's lease.   That has the effect of curtailing rent increases in apartments that Defendants prefer to "empty out" so that they can charge twenty percent (20%) rent increases to new tenants under the guise of "vacancy leases."   To accelerate the increase in rent increases, Defendants engage in a pattern and practice of refusing to recognize, or placing barriers in the way of obtaining, proper succession rights.   To facilitate that pattern and practice, Defendants misrepresent to tenants the amount and nature of evidence required to confirm their succession rights to the apartments they occupy and in which they have resided, often for many years.

120.    Plaintiffs have identified a confidential witness, a former rental agent and employee of Defendant Two Trees, who confided to certain tenants of Court House that Defendants Two Trees and 125 Court Street intentionally sat down and agreed in advance to take part in an unlawful scheme to illegally charge inflated rents to rent-stabilized tenants.

121.    Defendants' false and fraudulent statements included misrepresentations contained in leases written for initial tenants stating that the actual rents written into the initial leases were "preferential rents" when, by operation of law, the actual rents charged to initial rents (if lower than the initial rent determined by HPD) become the initial legal rents for the apartments

**Misrepresenting the Cost and Nature of Improvements**

122.    The base rent can be increased by adding a percentage of the cost the landlord has spent on individual apartment improvements or major capital improvements.   Defendants have engaged in a pattern and practice of misrepresenting the cost and nature of those improvements

40

to justify increasing rents, including, without limitation, by misrepresenting that renovation took place to improve apartments when, in actuality, the work done was for the repair of construction defects, which are rampant throughout Court House.  In addition, Defendants have engaged in a pattern and practice of charging tenants for improvements that have not actually been made, or in amounts not actually expended, which cannot lawfully be used to increase the legal rent demanded of tenants.

### *Interstate or Foreign Commerce*

123.    Defendants utilized interstate commerce through the use of certified mail, as described above, interstate wires in communicating with tenants and moving the proceeds of their enterprise, and in using other instrumentalities of interstate commerce in order to perpetrate their racketeering enterprise.  Moreover, Defendant DW Associates, one of the associates of the Walentas Enterprise, is based in New Jersey, as set forth in ¶14, above.

### *Pattern of Racketeering*

124.    Defendants' mail fraud (18 U.S.C. §1341), wire fraud (18 U.S.C. §1343), extortion (18 U.S.C. §1951) and obstruction of justice/obstruction of State or local law enforcement (18 U.S.C. §1503 *et seq*.; 18 U.S.C. §1511), as set forth above, constitutes "racketeering activity" and predicate acts under RICO.

125.    Here, Defendants used certified mail and interstate wires as part of a plan or scheme to defraud New York City municipal government out of Section 421-a tax benefits, and as part of a scheme to overcharge and exploit tenants.  Defendants' actions were willful and intentional, foreseeable, and involved actual use of the mails and interstate wires to further their scheme, including: (i) mailing in a fraudulent Section 421-a application; (ii) mailing the fraudulent Initial Rent Registration to DHCR; (ii) mailing fraudulent Initial Rent Registrations to

each initial tenant of Court House; and (iv) mailing fraudulent Amended Rent Registrations to DHCR and each of the tenants of Court House.

### THE HARM SUFFERED BY THE NAMED PLAINTIFFS

#### Plaintiff Court House Tenants Association

126.   Court House Tenants Association is a not-for-profit, tenant-run association incorporated for the purpose of allowing its members to associate for their mutual benefit as tenants, to represent its members' point of view to owners and managing agents, to provide its members with information relating to their rights as tenants, to promote good will and cooperation among its members, and generally to do any and all acts suitable, proper and conducive to the successful conduct of a Court House Tenants Association.

127.   Court House Tenants Association's members include residents of 125 Court Street, including plaintiffs Scrivo and Lebed.

128.   Court House Tenants Association continues to suffer injury to its business as a result of Defendants' illegal activity against Court House Tenants Association.  Court House Tenants Association devotes significant resources to identifying and counteracting Defendants' unlawful scheme, with the consequent drain on the organization's resources, deflecting them away from its daily activity to the pursuit of legal efforts against Defendants' scheme, including investigation of Defendants' scheme and the filing of the instant lawsuit.

129.   Court House Tenants Association also continues to suffer injury to its members and their respective associational ties.  Members of Court House Tenant Association operating to investigate and counteract Defendants' unlawful scheme fear harassment, retaliation, coercion, and reprisal by Defendants if their associational ties to Court House Tenant Association are revealed.  Members also fear that they will be victims of baseless eviction proceedings and, as a

foreseeable result, blacklisted by prospective future landlords if their associational ties to Court House Tenant Association are revealed.

130.    Court House Tenants Association also has standing to sue as the representative of its members, who would otherwise have standing to sue in their own right.  Court House Tenants Association seeks to protect interests germane to its purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit.

**Plaintiff Richard Lebed**

131.    Plaintiff Richard Lebed has been a tenant of Court House since 2005.  He has resided in unit 8SH units continuously since 2005.

132.    On or about April 10, 2005, Defendants provided Mr. Lebed with a "Rent Stabilized Lease" for the lease term from May 1, 2005 through April 30, 2007.  The lease falsely recited that the "monthly legal regulated rent" for the unit was $4575/month, an amount well above the HPD-approved maximum initial rent of $3340.  In reality, because the actual rent agreed to in the lease was $1761/month, the true amount of Legal Registered Rent for the unit should have been stated as $1761/month, and all rent increases in connection with renewal leases for the unit should have been based upon adjustment of the $1761/month figure (setting aside, momentarily, that as set forth in ¶134, below, even the $1761/month figure provided overstates what the legal rent should be in the event that the lease is found to be *void ab initio* due to Defendants' fraud).

133.    The lease documentation provided to Mr. Lebed in connection with the 2005 lease included a "Rent Stabilization Lease Rider" setting forth the key statutory provisions applicable to: (i) lease renewals for rent stabilized units; (ii) initial and annual rent registration of such units; and (iii) penalties applicable to landlords for non-compliance, including, but not limited to the

provision that failure to register shall bar an owner from applying for or collecting any rent increases until such registration has occurred.  The provision of this information to Mr. Lebed, by Defendants, demonstrates that Defendants had actual knowledge of the statutory rules applicable to rent stabilized units, and that their deviation from these requirements was intentional and willful.  As in the lease, as described in the preceding paragraph, the Rent Stabilization Lease Rider falsely stated that the last legal regulated rent for unit 8SH was $4575/month.

134.    On or about April 10, 2005, in connection with the lease, Defendants provided to Mr. Lebed with a "Temporary Rent Concession Rider" which admitted that the apartments in Court House "are each subject to the Rent Stabilization Law and Code by virtue of the Owner of the subject premises receiving tax benefits pursuant to §421-a of the Real Property Tax Law." The rider also recited that "The parties agree that the legal regulated rent for the subject apartment is $4575 per month, as set forth in the Lease between the parties for the Premises dated 5-1-05."  This statement was false for the reasons stated in the preceding paragraphs. Moreover, under New York law, an agreement between parties that purports to alter the applicable legal regulated rent for a rent stabilized apartment is *void ab initio* as a violation of public policy.  The rider also falsely misrepresents that the actual rent paid, $1761/month, represents a "temporary concession of rent" in connection with "a temporary down-turn in the rental market."  These statements are false, for the reasons set forth in ¶83 above.

135.    On or about April 10, 2005, Defendants provided to Mr. Lebed another rider entitled "Apartment Lease Rider" which admitted that the owners of Court House had applied to 421-a benefits, but misleadingly stated that the apartment subject to the lease "may become subject to the Rent Stabilization Law by reason of a 412-a exemption…."  This statement was

false and misleading because it falsely misrepresented that Court House was not yet subject to the rent stabilization law.

136.    On or about June 20, 2005, in connection with his two year lease commencing May 1, 2005, Defendants sent a copy of the Initial Apartment Registration for unit 8SH to Mr. Lebed *by certified mail*.  The Initial Apartment Registration falsely states the "Legal Registered Rent" for the unit as $4575/month, for the same reasons set forth in the two preceding paragraphs.    Moreover, the Initial Apartment Registration also falsely stated that the $1761/month of Actual Rent Paid was a "Preferential" rent and that the apartment was "Exempt" from rent stabilization due to "High-Rent, Vacancy Deregulation," when, as set forth in ¶83 above, these statements were false.

137.    At the conclusion of the 2005 lease, Defendants sent Mr. Lebed signed an offer to renew the lease for either one or two years.  The renewal lease contained the false statement that the Legal Rent on September 30th of the prior year was $4575/month, which was false for the reasons set forth in the preceding paragraphs.  The renewal lease also contained false statements about what the new legal rents would be at the conclusion of a 1 year lease and 2 year lease, in the amounts of $4785.30 and $4922.55/month, based upon the RGB-approved increase percentages of 3.75% and 6.75%, respectively.  The lease renewal offer also unlawfully added that a 2.2% increase of $38.74 was applicable, and unlawfully added that amount into the calculation of the purported new legal rents at the conclusion of the lease term.  Defendants were not entitled to a 2.2% increase so early into the tax benefit period (they would be entitled to start charging such increases approximately 15 years later) and, at such time, the increase would be considered an additional charge not included in the calculation of the applicable legal rents.

138.    In reliance upon Defendants' false and misleading statements, Mr. Lebed renewed the lease, accepting Defendants' demand for an actual rent of $2042/month.  Accordingly, Mr. Lebed paid the amounts demanded by Defendants not realizing that he was being overcharged.

139.    Defendants' renewal lease charged Mr. Lebed an unlawfully high rent.  Had the actual rent paid previously ($1761/month) been adjusted by the 6.75% increase amount approved by the RGB, the renewal lease would have reflected an offer to renew the lease at $1866.66/month, instead of the $2042/month reflected in the renewal lease.

140.    Upon expiration of the renewal lease, which covered the period from May 1, 2007 through April 30, 2009, Mr. Lebed renewed the lease for successive two-year terms, to date. Each renewal lease provided to Mr. Lebed by Defendants contained false statements concerning the purported legal rent applicable to the year preceding the lease renewal and for the new legal rent for the next lease term upon expiration of the renewal.  For example, the lease renewals provided to Mr. Lebed misstated the monthly legal rents for the prior September 30th of each year as ($4592.55, $5312.04, $5590.75, and $2177.88 for 2009, 2011, 2013, and 2015, respectively).  Each lease renewal improperly unlawfully applied the RGB-approved increase percentages to the falsely stated purported legal rent, and unlawfully added a 2.2% increase, which was factored into a falsely stated new rents applicable to the next lease term at the conclusion of a one or two year lease.

141.    In connection with renewal offers, Defendants provided Mr. Lebed with additional Preferential Rent Riders, including on or about February 24, 2011, which falsely recited the "legal regulated rent" in unlawfully inflated amounts, and which falsely claimed that Mr. Lebed was receiving a "temporary rent concession" due to a "temporary down-turn in the rental market" when, as set forth in ¶83 above, these statements were false.

46

142.     In actuality, upon the renewal of Mr. Lebed's successive lease terms, **_Defendants_** **_were not entitled to any increase in the rent_**, because of Defendants' failure to file initial and amended rent registrations as required by law.  The failure by a landlord to file such rent registrations acts as a bar to charging or collecting **_any_** rent increase.

143.     Moreover, under New York Law, Defendants' fraud in connection with the lease and related documents voids the lease _ab initio_.  _See Grimm v. State of N.Y. Div. of Hous. & Comm'ty Renewal Off. Of Rent Admin.,_ 68 A.D.3d 29 (1st Dep't. 2010) ("where there is fraud or an unlawful rent, the lease is rendered void.  The legal rent should be established by using the lowest rent charged for a rent-stabilized apartment with the same number of rooms in the same building on the base date.").  Application of the holding in _Grimm_ requires that Mr. Lebed's legal rent for the base date be reset at $398/month, adjusted upon renewal at the RGB-approved increase percentages.

**Plaintiff Vinetta Scrivo**

144.     Plainiff Vinetta Scrivo has been a tenant of Court House since 2007.  She has resided in five different units since 2007, as follows:

a.     From 2007-2008, she resided in unit 3SF, a studio apartment;

b.     From 2009-2010, she resided in unit 7SE, a 2-bedroom apartment;

c.     From 2010-2011, she resided in unit 7NF, a 1-bedroom apartment;

d.     From 2011-2012, she resided in unit 8NE, a studio apartment; and

e.     From 2012 to present, she resided in unit 3SG, a 1-bedroom apartment.

145.     By law, when she initially moved into Court House, Defendants were required to notify Ms. Scrivo that her apartment, unit 3SF, was rent-stabilized.  Defendants failed to do so. Defendants were also required to provide Ms. Scrivo with a 421-A Rider, but they failed to do so.

146.     Defendants provided Ms. Scrivo with a lease for unit 3SF which falsely recited

47

that the monthly rent was a "preferential rent" of $2300, and that the apartment was subject to a purported maximum "legal rent" that was several hundred dollars higher. This was a fraudulently false statement, because the RSL and RSC provide a mechanism for determining legal rents that Defendants circumvented. Defendants falsified information used by HPD to determine and approve initial legal rents for apartments in Court House. Defendants also provided false rent registration information to DHCR concerning the historical rents paid by the initial tenants of each unit, including the units leased to Ms. Scrivo. The false information provided to DHCR falsely labeled the actual rents paid by the tenants as "preferential rents" which were lower than the "legal rents" Defendants included in the registrations. These statements were false, as set forth in ¶83 above.

147.    As with Mr. Lebed, described above, the lease renewal offers provided to Ms. Scrivo contained false statements concerning the legal rents applicable on September 30 of the year preceding the lease renewal, false statements about the actual rents paid by prior tenants, false statements concerning what the legal rent would increase to upon conclusion of the lease term, and false statements concerning the applicable rent increases contained in her renewal offers. Defendants also provided Ms. Scrivo with preferential rent riders which falsely stated that Ms Scrivo was receiving a "temporary rent concession due to a temporary downturn in the rental market reflective of temporarily depressed economic conditions." This statement was false for the reasons set forth in ¶83 above.

148.    Ms Scrivo relied upon Defendants' false statements and misrepresentations in connection with executing each of her lease renewals from 2007 through present. Accordingly, Ms. Scrivo paid the amounts demanded by Defendants not realizing that she was being overcharged. Moreover, based upon Defendants' false statements and misrepresentations, Ms.

48

Scrivo was coerced into surrendering her two-bedroom unit in order to move into a more affordable studio apartment.  Had Ms. Scrivo been charged the correct legal rent, she would have been able to keep her two bedroom apartment.

149.    In actuality, upon the renewal of Ms. Scrivo's successive lease terms, ***Defendants were not entitled to any increase in the rent***, because of Defendants' failure to file initial and amended rent registrations as required by law.  The failure by a landlord to file such rent registrations acts as a bar to charging or collecting any rent increase.

150.    Moreover, under New York Law, Defendants' fraud in connection with the lease and related documents voids the lease *ab initio*.  *See Grimm v. State of N.Y. Div. of Hous. & Comm'ty Renewal Off. Of Rent Admin.,* 68 A.D.3d 29 (1ˢᵗ Dep't. 2010) ("where there is fraud or an unlawful rent, the lease is rendered void.  The legal rent should be established by using the lowest rent charged for a rent-stabilized apartment with the same number of rooms in the same building on the base date).  Application of the holding in *Grimm* requires that Ms. Scrivo's legal rent for the base date be reset at $398/month, adjusted upon renewal at the RGB-approved increase percentages.

## CLASS ALLEGATIONS

### A.    Class Definition

151.    The named individual plaintiffs bring this action on their own behalf and, pursuant to Fed. R. Civ. P. 23 (b)(2) and (b)(3), as a class action on behalf of two classes of persons, defined as:

a. All persons who, as of the date of certification, are tenants in rent-regulated apartments in New York City directly or indirectly owned in whole or in part by the Walentas Enterprise (the "Injunctive Class");

b.   All persons who, at any time between January 1, 2005 and the date of certification, were tenants in rent-regulated apartments in New York City directly or indirectly owned in whole or in part by the Walentas Enterprise (the "Damages Class").

152.    The Injunctive Class seeks certification of claims for declaratory and injunctive relief, while the Damages Class seeks damages pursuant to 18 U.S.C. § 1962(d).

**B.    <u>Rule 23(a) – Typicality</u>**

153.    The named individual plaintiffs and the members of the class each and all have tangible and legally protectable interests at stake in this action.

154.    The claims of the named class representatives and the absent class members have a common origin and share a common basis.   Their claims originate from the same illegal, fraudulent, and deceptive practices of the Defendants, and the Defendants act in the same way toward the individual plaintiffs and the members of the class.   Each named individual plaintiff has been the victim of one or more of the following illegal practices at the hands of Defendants: intentionally misrepresenting the rent-regulated status of apartments to new tenants; intentionally misrepresenting the legal rent chargeable for the unit; intentionally misrepresenting the nature and cost of improvements done to justify rent increases; intentionally misrepresenting the amount of rent that is due; intentionally sending baseless eviction notices based upon fraudulent misrepresentations concerning the amount of rent allegedly due; intentionally instituting baseless court proceedings based upon fraudulent misrepresentations concerning the amount of rent allegedly due, extorting excessive rent payments through fraudulent misrepresentations concerning the amount of legal rent; and coercing tenants into moving out based upon fraudulent

misrepresentations concerning the amount of legal rent and attendant demands for unlawfully high rent increases for renewal leases.

155.    All rent regulated tenants either have been subjected to, or are at risk of being subjected to, the same general course of allegedly fraudulent and harassing conduct, and the same pattern of racketeering.

156.    The proposed class representatives state claims for which relief can be granted and are typical of the claims of absent class members.  If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely on the same remedial theories, and seek the same relief.

157.    The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the class will be prosecuted with diligence and care by the individual plaintiffs as representatives of the class.

**C.      Rule 23(a) – Numerosity**

158.    The members of the class are so numerous that joinder of all members is impracticable.  The Walentas Enterprise owns or controls more than 12 buildings comprising more than 2,000 apartments.  Based on information available from bond offering documents financing the buildings owned by the Walentas Enterprise, a large portion of those apartments is rent-regulated.

159.    On information and belief, Defendants' illegal actions are widespread throughout the Walentas Enterprise's properties.  The class is ascertainable from records maintained by the Defendants.

**D.**     **Rule 23(a) – Commonality**

160.     The questions of law and fact common to the class include, among other things:

(a)     whether Defendants have engaged in mail fraud, wire fraud, extortion, obstruction of justice and transportation of stolen property;

(b)     whether Defendants have engaged in a pattern of racketeering activity;

(c)     whether the Walentas Enterprise identified herein is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(d)     whether Defendants conducted or participated in the affairs of the Walentas Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(e)     whether Defendants' overt or predicate acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to the individual plaintiffs' and class members' business or property;

(f)     whether Defendants act or refuse to act on grounds generally applicable to the individual plaintiffs and the class members;

(g)     whether Defendants have established a practice or policy of  misrepresenting tenants' rent stabilization status or of failing to notify tenants that their apartments are rent stabilized;

(h)     whether Defendants have established a practice or policy of misrepresenting to prospective tenants the prior rent charged to previous tenants of apartments they own;

(i)     whether Defendants have established a practice or policy of misrepresenting the prior legal rent applicable to apartments they own;

(j)     whether Defendants have established a practice or policy of misrepresenting the new legal rent that will be applicable to apartments they own at the conclusion of their lease terms;

52

(k)     whether Defendants have established a practice or policy of claiming tenants owe additional rent when they do not;

(l)     whether Defendants have established a practice or policy of sending eviction notices based upon fraudulent misrepresentations concerning the amount of legal rent owed;

(m)     whether Defendants have established a practice or policy of instituting eviction proceedings against tenants based upon fraudulent misrepresentations concerning the amount of legal rent owed;

(n)     whether Defendants have established a practice or policy of misrepresenting tenants' succession rights;

(o)     whether Defendants have established a practice or policy of misrepresenting the amount of legal rent applicable to renewal leases to coerce tenants into vacating their apartments;

(p)     whether Defendants have established a practice or policy of misrepresenting to tenants that repairs of construction defects were actually renovations and/or improvements;

(q)     whether the Defendants have established a practice or policy of subjecting tenants to involuntary displacement.

## E.     Rule 23(a) – Adequate Representation

161.    The named individual plaintiffs are willing and prepared to serve the Court and the proposed class in a representative capacity with all of the obligations and duties material thereto.  The individual plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse to or that directly and irrevocably conflict with, the interests of the other class members.

162.    The self-interests of the proposed class representatives are co-extensive with, and not antagonistic to, those of the absent class members.  The proposed class representatives will undertake to protect the interests of the absent class members.

163.    The named individual plaintiffs have engaged the services of the counsel indicated below.  Those counsel are experienced in complex litigation, will adequately prosecute this action, and will assert, protect, and otherwise well represent the proposed class representatives and the absent class members.

**F.**    **Rule 23(b)(1)**

164.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants toward the class members.

**G.**    **Rule 23(b)(2)**

165.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**H.**    **Rule 23(b)(3)**

166.    The questions of law and fact common to members of the class predominate over any questions affecting only individual members.

167.    A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein because:

    a.    individual claims by class members are impractical as the costs of pursuing them far exceed what any one individual plaintiff or class member has at stake;

54

b.   though some potential class members are, or have been, engaged in litigation with at least one of the Defendants or their affiliates, the baselessness of Defendants' claims against them is part of the Defendants' scheme to impose costs on and to harass the class members as a means of illegally driving up their rents or of inducing them to vacate their apartments

c.   individual members of the proposed class have no interest in prosecuting and controlling separate actions, and requiring them to do so would impose a significant burden of exactly the type the Defendants seek to impose on them;

d.   it is desirable to concentrate litigation of the claims asserted herein in a single forum;

e.   the proposed class action is manageable.

## COUNT I (RICO Section 1962(c))

### (conducting the affairs of an enterprise through a pattern of racketeering, or the collection of an unlawful debt)

168.   Plaintiffs re-allege each and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

169.   Defendants have formed a RICO enterprise comprised of an association-in-fact for the common, shared purpose of obtaining Section 421-a tax benefits while simultaneously avoiding the rent stabilization regime applicable to developments benefiting from Section 421-a tax breaks.  All Defendants exercised a managerial role in the enterprise's affairs, acting on its behalf for the common purpose.

170.   All Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§1962(c).

55

171.    Defendants have continuously engaged in this conduct, including, but not limited to: mailing false applications for Section 421-a benefits; mailing false and fraudulent Initial Rent Registration statements; mailing false and fraudulent Amended Rent Registration statements; fraudulently registering units within Court House as "exempt" from rent stabilization; mailing fraudulent Initial Rent Registration statements to tenants; mailing and wiring fraudulent statements of maximum legal rents and preferential rent amounts to tenants; fraudulently misrepresenting the rent stabilization status of Court House; fraudulently omitting to provide required annual certified rent registrations to municipal authorities; fraudulently charging initial tenants of Court House unlawfully high rents by falsely representing to the tenants that they were receiving "preferential rents" that were below the "maximum lawful rents," when in fact the maximum lawful rent for an initial tenant is identical to the initial rent actually paid by the first tenant; unlawfully and fraudulently increasing the rental amounts in tenants' renewal leases; and falsely and fraudulently misrepresenting the amounts stated in the leases of Court House to be the preferential rents and maximum lawful rents.

172.    All Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to engage in a continued pattern of racketeering activity affecting interstate commerce in violation of 18 U.S.C. 1962(c) by means of: (1) mail fraud (18 U.S.C. §1341); (2) wire fraud (18 U.S.C. §1343); (3) extortion (18 U.S.C. §1951) and (4) obstruction of justice (18 U.S.C. §1503).

173.    Plaintiff Court House Tenants Association has organizational standing to represent tenants in Court House who have sustained injury to their business or property by reason of Defendants' violation of 18 U.S.C. §1962.

174.    Plaintiffs Vinetta Scrivo and Richard Lebed, and all others similarly situated, are tenants in Court House who have sustained injury to their business or property, including concrete financial losses, by reason of Defendants' violation of 18 U.S.C. §1962.

175.    Members of the purported damages class also include persons that have been coerced into moving out of Court House as a result of Defendants' fraudulent statements and omissions concerning renewal leases containing unlawfully high renewal rents.  These purported class members have, as a result, been deprived of their legal rights to renew their leases and use their rental property.

## COUNT II (RICO Section 1962(d))

### (conspiring to violate section 1962 (c))

176.    Plaintiffs re-allege each and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

177.    All Defendants knowingly agreed to participate in and facilitate the operation of an enterprise through a pattern of racketeering activity _and_ also knowingly agreed that at least two (2) predicate acts would be engaged in to further the interests of the racketeering enterprise. In so agreeing, all Defendants participated in the conspiracy with knowledge of the essential nature of the plan: to obtain Section 421-a tax benefits while simultaneously depriving tenants of the protections of the New York rent stabilization regime.  All Defendants actually benefited from an infusion of racketeering income as a result of their participation in the racketeering enterprise.

178.    Plaintiff Court House Tenants Association has organizational standing to represent tenants who have sustained injury to their business or property by reason of Defendants' violation of 18 U.S.C. §1962.

57

179.    Plaintiffs Vinetta Scrivo and Richard Lebed, and all others similarly situated, are tenants in Court House who have sustained injury to their business or property, including concrete financial losses, by reason of Defendants' violation of 18 U.S.C. §1962.

180.    Members of the purported class also include persons that have been coerced into moving out as a result of Defendants' fraudulent statements and omissions concerning renewal leases containing unlawfully high renewal rents.  These purported class members have, as a result, been deprived of their legal rights to renew their leases and use their rental property.

**COUNT III**

**(REFORMATION OF CONTRACT)**

181.    Plaintiffs re-allege each and incorporate by reference all allegations in all preceding paragraphs as if fully set forth herein.

182.    The apartment leases of Plaintiffs and members of the purported class fail to reflect the true intent of the parties because the rental amounts contained therein were the subject of the knowing, intentional, fraudulent, false statements and omissions made by Defendants, as set forth in detail, above, that the lease contracts embodied the real agreement of the parties.  To reflect the true intent of the parties, those lease contracts should provide for the proper legal rental amounts, pursuant to the formulas set forth in the New York Rent Stabilization Law and the New York City Rent Stabilization Code.

183.    Without the knowledge of the true facts and in reliance on Defendants' false representations and omissions, Plaintiffs and members of the purported class were deceived and misled into signing a writing that differed materially from the true agreement of the parties.

184.    Plaintiffs – and members of the purported class's – reliance on Defendants' false representations that the lease contracts conformed to the true agreement of the parties was reasonable and justified in that Plaintiffs (and members of the purported class) have no access to

information that would confirm (or contradict) Defendants' representations and omissions concerning, without limitation: (1) the initial rent paid by the first tenant in the applicable rental unit; (2) the historical rental amounts paid by the initial tenant upon lease renewal, if any; (3) the historical rental amounts paid by subsequent tenants after any vacancy by the initial tenant; (4) the maximum legal rents applicable to units in Court House; and (5) historical "preferential rents" (*i.e.* rental rates below the applicable maximum legal rent) charged to prior tenants.

185.    The only information accessible to tenants concerning previous rents for their units are the rental history documents provided by DHCR.  Those rent histories expressly state that DHCR cannot attest to the truthfulness of the rental information provided because DHCR does not verify information submitted to DHCR by landlords.

186.    The rental lease contracts of Plaintiffs and members of the purported class are all subject to the equitable remedy of reformation due to unilateral mistake of fact induced by the fraud of Defendants, including 125 Court and Two Trees, warranting the equitable intervention of the Court.

187.    Plaintiffs, and those similarly situated, will suffer unless the leases are reformed to reduce the rental amounts to the correct amounts authorized by law.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all those similarly situated, demand judgment against Defendants as follows:

188.    At the earliest possible time, Plaintiffs should be allowed to give notice of this class action, or the Court should issue such notice, to all members of the purported classes as defined herein.  Such notice should inform them that this civil action has been filed, of the nature of the action, and of their right to opt-out of this lawsuit;

189.    Designation of Plaintiffs as representatives of the purported classes, and Plaintiffs' counsel as counsel for the purported classes;

190.    Equitable tolling of any applicable statute(s) of limitations as a result of the Defendants' willful concealment of the facts underlying the claims of Plaintiffs and the purported classes;

191.    A jury trial on issues to determine liability and damages;

192.    Certification of this action as a class action pursuant to Rule 23 of the Civil Rules of Civil Procedure for purposes of the claims brought on behalf of all members of the purported classes;

193.    Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

194.    A judgment declaring that the practices complained of herein are unlawful and in violation of 18 U.S.C. §1962, New York Real Property Law Section 421-a, New York City's Rent Stabilization Law and New York City's Rent Stabilization Code;

195.    A judgment declaring that all leases issued in connection with Court House are unlawful, *void ab initio*, and subject to reformation;

196.    A judgment for equitable reformation of all leases issued in connection with Court House, reforming the base rents based upon the default formula set forth in *Grimm v. State of N.Y. Div. of Hous. & Comm'ty Renewal Off. Of Rent Admin.,* 68 A.D.3d 29 (1st Dep't. 2010);

197.    A judgment declaring that all Section 421-a benefits issued in connection with Court House are revoked, null and void;

198.    All damages which Plaintiffs and all members of the purported classes have sustained as a result of Defendants' conduct, including but not limited to rent overcharges, costs and expenses of moving, and costs of obtaining substitute housing at rental prices in excess of the legal rent that the tenants were entitled to have while residing in Court House;

199.    An award of treble damages under 18 U.S.C. §1962 and/or New York's Rent Stabilization Code (9 NYCRR §2526.1(a)(1));

200.    Appointment of an independent monitor to oversee the lawful operation and management of the rent-regulated buildings owned by Defendants and to assist in the resolution of disputes between Defendants and their tenants;

201.    Disgorgement of all 421-a benefits wrongfully and fraudulently obtained by Defendants;

202.    An award to Plaintiffs of their costs and disbursements incurred in connection with this action, including attorneys' fees, expert witness fees, and other costs;

203.    An award to the Plaintiffs and all members of the purported Damages Class of pre-judgment and post-judgment interest, as provided by law, at the highest applicable rate; and

204.    Granting Plaintiffs and all members of the purported classes such other and further relief as the Court finds necessary and proper.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

Dated: January 31, 2017
New York, New York

VALLI KANE & VAGNINI LLP

/s/ Matthew L. Berman
Matthew L. Berman
Robert J. Valli, Jr.
600 Old Country Road
Garden City, New York 11530
Tel: (516) 203-7180
Fax: (516) 706-0248
mberman@vkvlawyers.com
rvalli@vkvlawyers.com
*Attorneys for Plaintiffs*